UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
(TAMPA DIVISION)

BEST DEAL BLUEBERRIES, INC.,              Case No. 8:10-bk-08320-MGW
                                          Chapter 12

　　　　Debtor
_____/

## SOUTHERN SPECIALTIES EMERGENCY MOTION TO
## DISMISS DEBTORS CASES FOR LACK OF GOOD FAITH

**(Emergency Motion Requested)**

　　　　Southern Specialties, Inc., moves pursuant to Bankruptcy Code Section 1208(c) to
dismiss the chapter 11 cases of Best Deal Blueberries, Inc. and D G Diehl Farms, Inc.
("**Debtors**") and states:

### Preliminary Statement

　　　　1.　　　Debtors filed their case in bad faith and solely to avoid complying with a March
18, 2010 state Court Order requiring them to comply with their March 1, 2009 exclusive
Marketing Agreement with Southern Specialties. Under that Agreement, Southern Specialties is
the exclusive agent to market and sell all tomatoes and blueberries the Debtors grow and harvest.

　　　　2.　　　The state court entered that order in response to the Debtors willfully violating the
Marketing Agreement by entering into a separate contract to sell their blueberries to a third party
competitor, VIP Marketing. The breach by the Debtors will irreparably harm Southern
Specialties because Southern Specialties has committed to sell the Debtors' blueberries to various
customers and Southern Specialties cannot procure replacement blueberries from an alternative
source at this late stage of the blueberry season.

　　　　3.　　　Thus, unhappy with the State Court's ruling, the Debtors now seek to relitigate
their dispute before this Court. Such an abuse of the bankruptcy process should not be tolerated

by the Bankruptcy Court, and instead Southern Specialties respectfully requests that the Court dismiss this case and permit the state court to resolve this dispute.

## II.    FACTUAL BACKGROUND

4.    Southern Specialties is in the business of marketing and distributing fresh fruits and vegetables in the United States and Canada. The Debtors are farming companies that grow, harvest and package fruits and vegetables.

5.    On March 1, 2009, Southern Specialties and the Debtors entered into an exclusive marketing agreement (the "Marketing Agreement") pursuant to which the Debtors appointed Southern Specialties their exclusive agent to market and sell their blueberries and tomatoes from March 1, 2009 though June 1, 2011. The Marketing Agreement provides as follows:

> GROWER, during the term of this Agreement and any renewals thereof, hereby appoints SOUTHERN as its exclusive agent to market in the Territory all Produce which is harvested, procured, sourced and/or produced by GROWER and/or its agents, representatives and/or affiliated companies and shall not sell, transfer, consign or otherwise market its Produce to or through anyone other than SOUTHERN.

See Marketing Agreement, ¶ 2, a true and correct copy of which is attached thereto as **Exhibit A.**

6.    In order to secure the Marketing Agreement, Southern Specialties agreed to advance funds to the Debtors to cover expenses associated with growing, harvesting and packaging the produce. Through the date of this Motion, the Debtors owe Southern Specialties in excess of Three Hundred Thousand Dollars ($300,000) for advances made.

7.    On March 8, 2010, Southern Specialties learned that VIP Marketing filed a UCC 1 financing statement in Florida against the Debtors' crops to secure payment of advances made.

2

Thereafter, Southern Specialties contacted VIP to determine the circumstances surrounding the financing statement. VIP confirmed that it had entered into a contract to purchase blueberries from the Debtors.

8.     Immediately thereafter, counsel for the Debtors advised Southern Specialties counsel that the Debtors do not intend to comply with their obligations under the Marketing Agreement to sell blueberries to Southern Specialties.

9.     In reliance on the supply of blueberries it was to receive under the Marketing Agreement, Southern Specialties made commitments to supply blueberries to various customers including Sam's Club, Sobeys, Inc., Whole Foods, Wakefern, H.E. Butt, United Supermarkets and Lunds.

10.     The Florida blueberry harvest has commenced. As a result, Southern Specialties cannot obtain an alternative source to replace the blueberries from the Debtors.

11.     If Southern Specialties does not meet its obligations to its customers, it will suffer damage to its goodwill and reputation in the industry which is not quantifiable.

12.     The Debtors agreed, pursuant to the terms of the Marketing Agreement, that a breach of the Marketing Agreement would cause irreparable harm to the non-breaching party entitling the non-breaching party to injunctive relief. The Marketing Agreement provides in pertinent part as follows:

> Each party agrees that its obligations hereunder are necessary and reasonable in order to protect the other party and the other party's business, and expressly agrees that *monetary damages would be inadequate to compensate the other party for any breach of any covenant or agreement set forth herein.* Accordingly, each party agrees and acknowledges that *any such violation or threatened violation will cause irreparable injury to the other party* and that, in addition to any other remedies that may be available, in law, in equity or otherwise, *the other*

> *party shall be entitled to obtain injunctive relief against the threatened*
> *breach of this Agreement,* or the continuation of any such breach, without
> the necessity of proving actual damages. Each party expressly waives the
> defense that a remedy in damages will be adequate, and further waives any
> requirement, in an action for specific performance or injunction, for the
> posting of a bond.

*See* ¶ 14.12 of the Marketing Agreement.

13.     Given the Debtor's unjustified refusal to comply with the Marketing Agreement
and the resulting irreparably harm that would cause, Southern Specialties has no choice but to
seek legal relief. Accordingly, Southern Specialties files a Complaint against the Debtors in the
17th Circuit in and for Broward County, seeking, among other things, injunctive relief and
specific performance.

14.     On March 18, 2010, the Broward County Court granted Southern Specialties
request for an injunction, and ordered the Debtors to comply with the Marketing Agreement. A
true and correct copy of the Order is attached hereto as **Exhibit B**.

15.     On April 9, 2010, the Debtors filed separate petitions for Chapter 12 relief, and
simultaneously filed bare-bones motions to reject the Marketing Agreement with Southern
Specialties.

## **RELIEF REQUESTED**

16.     Unable to prevail in State Court, the Debtors are using this bankruptcy in bad
faith as a means of obtaining the proverbial second bite of the apple. The Court should dismiss
their case and allow this matter to proceed in State Court.

17.     Bankruptcy Code Section 1208(c) provides for dismissal of a Chapter 12 case for
cause, including, but not limited to, the reasons listed in 11 U.S.C. § 1208(c)(1)-(9). *And see* 11
U.S.C. § 102(3) (use of including not limiting). The filing of a Chapter 12 petition for relief in

4

bad faith is cause for dismissal of the case. *See In re Perez,* 43 B.R. 530 (Bktcy.S.D.Tex.1984); *In re Chin,* 31 B.R. 314 (Bktcy.S.D.N.Y.1983). *And see Buffkin v. Puckett (In re Puckett),* 745 F.2d 50 (4th Cir.1984).

18.     To determine whether a chapter 12 petition has been filed in bad faith, courts often look to the same factors analyzed in the chapter 13 context. *In re Massie,* 231 B.R. 249, 252 (Bankr.E.D.Va.1999).   As a matter of fact, in *In re Waldron,* 785 F.2d 936 (11th Cir. 1986), the Eleventh Circuit dismissed a Chapter 13 case because a financially secure husband and wife filed their case solely for the purpose of rejecting an option agreement which they felt was not as profitable as could be.   The Circuit found that debtors' plan was proposed in a bad-faith attempt to use and abuse Chapter 13 for a greedy and unworthy purpose. *Waldron* at 939-40.

19.     Here, it appears that the Debtors financially secure and have filed their case simply because they believe that their Marketing Agreement with Southern Specialties is not as profitable as it could be.   To cite but one example, Debtor's combined assets – including the blueberries that the Debtors have not valued on their schedules – roughly equal the amount of its liabilities.   To cite another example, the proposed marketing agreement with VIP Marketing – to the extent that they have been disclosed at all – appear to be no better that that provided for under the Southern Specialties Marketing Agreement.

20.     Given these circumstances, the Court should dismiss the Debtors petition as one filed in bad faith, and allow this matter to continue to be resolved in state court.

WHEREFORE, Southern Specialties, Inc., respectfully requests that this Court dismiss Debtors cases and grant such further relief as the court deems equitable.

DATED this 15th day of April, 2010.

INFANTE, ZUMPANO, HUDSON & MILOCH, LLC
Attorneys for Southern Specialties, Inc.
500 S. Dixie Highway, Suite 302
Coral Gables, FL 33146
Telephone: (305) 539-3814
Facsimile: (305) 774-5901
Email: luis.salazar@izhmlaw.com


By: ___ s/ Luis Salazar _____
   Luis Salazar
   Florida Bar No. 0147788

# MARKETING AGREEMENT

This AGREEMENT is made and entered into this 1st day of March, 2009 by and between SOUTHERN SPECIALTIES, INC. a Florida corporation, (hereinafter referred to as "SOUTHERN") and BEST DEAL BLUEBERRIES, INC. and DG DIEHL FARMS, INC., Florida corporations (collectively hereinafter referred to as "GROWER").

## WITNESSETH

WHEREAS, GROWER is in the business of growing, harvesting, procuring, packing and/or packaging BLUEBERRIES and TOMATOES (All Varieties), meeting USDA No. 1 standard (the "Produce"), for export and sale in North America (the "Territory"), in compliance with the rules, regulations, codes and specifications established by the United States Department of Agriculture, (hereafter "USDA") as amended from time to time; and

WHEREAS, SOUTHERN is in the business of marketing Produce in the Territory;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1. **RECITALS.** The above recitals are true and correct and incorporated herein by reference.

2. **AGENT.** GROWER, during the term of this Agreement and any renewals thereof, hereby appoints SOUTHERN as its exclusive agent to market in the Territory all Produce which is harvested, procured, sourced and/or produced by GROWER and/or its agents, representatives and/or affiliated companies and shall not sell, transfer, consign or otherwise market its Produce to or through anyone other than SOUTHERN.

3. **TERM.** The term of this Agreement shall be effective as of March 1, 2009 and continue until June 1, 2011 (the original "Term"). The Agreement shall be automatically renewed for successive one year periods unless either party gives forty-five (45) days written notice to the other party of an intention to terminate this Agreement prior to the expiration of the Term, and each yearly anniversary thereafter. In the event GROWER terminates this Agreement, then GROWER shall be obligated to immediately pay SOUTHERN all remaining obligations due and owing by GROWER to SOUTHERN under this Agreement.

4. **COMMISSION.** In consideration of the services to be provided by SOUTHERN, GROWER shall pay SOUTHERN a commission of Nine Percent (9%) of the sales price of each flat of Produce and a handling fee of ($0.35) PER FLAT on NON-Direct shipments. These amounts shall be deemed Cost Expenses (as hereinafter defined), and deducted from the proceeds derived from sale or disposition of the Produce.

5. **OBLIGATIONS OF GROWER.** GROWER shall consign to SOUTHERN all Produce it grows for each season during the Term. The Produce shall conform to the specifications requested by SOUTHERN and meet USDA No. 1 Grade condition. SOUTHERN shall act as GROWER's exclusive agent for the sale of such Produce. SOUTHERN may notify



**EXHIBIT**

**1**

tabbies    " A "

6. **OBLIGATIONS OF SOUTHERN.** SOUTHERN shall perform or cause to be performed, for the benefit, and at the expense of GROWER, all operations appropriate and commonly used in the produce distribution industry, including, but not limited to receiving, re-grading, re-packaging, warehousing, distributing, selling, and such other and further actions which SOUTHERN deems necessary for the marketing of the Produce, all of which shall be reimbursed to SOUTHERN from the sales proceeds or by GROWER as herein provided in this Agreement.

6.1 SOUTHERN made certain pre-season advances to GROWER in connection with a prior marketing agreement for tomatoes between the parties. Said advances totaled $359,175 ($459,175 less a credit of $100,000) and have accrued interest of $20,637 through February 28, 2009. Said advances were memorialized in a series of promissory notes from GROWER to SOUTHERN. The new advances and the old advances, plus interest, (hereinafter each an "Advance"), presently totaling $379,812 shall be memorialized in a new amended and restated promissory note, in the form attached hereto as Exhibit "B". SOUTHERN shall be reimbursed the advances and interest earned by taking deductions from the Liquidations (as hereinafter defined), in accordance with the payback schedule indicated on Exhibit "A" ("Payback Rate"), before any payments are made to GROWER. SOUTHERN may adjust the Payback Rate in accordance with any additional advance distributions made to GROWER to recover the total advance balance by the end of season. GROWER may increase the Payback Rate at any time to accelerate payback of advance balance

6.3 SOUTHERN will extend to GROWER weekly program advances. These weekly advances will be based on a SOUTHERN estimated weekly sale price and paid in accordance with Exhibit "A" ("Farm flat adv-weekly" rate). Program advances to be deducted from related Purchase Order liquidations at time of settlement and/or from any subsequent liquidations between parties, if necessary, to recover program advance balance.

6.4 During the Term, SOUTHERN and GROWER may agree to additional advances from SOUTHERN to GROWER, which amounts shall be repaid from all liquidations between the parties, including the liquidations hereunder.

6.5 SOUTHERN shall be responsible for all arrangements necessary to pick-up the Produce from GROWER and deliver the Produce to SOUTHERN's designated refrigerated warehouse, subject to a delivery charge, which charge shall be deemed a Cost Expense (as defined hereinafter).

6.6 SOUTHERN is authorized to re-pack the Produce, at GROWER's expense, using SOUTHERN's facilities or a subcontractor (which may be related entity to SOUTHERN), if necessary in SOUTHERN's reasonable judgment SOUTHERN shall consult with GROWER before undertaking this action.

6.7 SOUTHERN will notify GROWER of any charges needed to be performed to make the Produce acceptable for sale in any commercially reasonable manner based on SOUTHERN's best business judgment, and SOUTHERN is authorized to take such measures as it deems necessary to make the Produce saleable, which costs shall be reimbursed by GROWER.

6.8   Provided SOUTHERN has received advance notice of shipment and it arrives in USDA No. 1 condition, SOUTHERN will advance and pay all third-party costs on behalf of the GROWER such as USDA inspector and certification, freight and drayage along with any other costs necessary to handle the Produce from its arrival at the port to its delivery at SOUTHERN's warehouse or to SOUTHERN's customer(s), all of which shall be reimbursed to SOUTHERN as herein set forth and prior to any payments to GROWER.

6.9.   SOUTHERN and GROWER will determine all packaging and labeling requirements, subject to paragraph 5.5 above.

6.9a   GROWER shall have the option, at its sole cost, of placing a representative at warehouse to help supervise the delivery of the Produce and its arrival condition.

7.   **CONSIGNMENT.**   All Produce shall be handled by SOUTHERN for GROWER on a consignment basis. In no case, unless otherwise agreed, shall shipments be considered as a purchase of said Produce by SOUTHERN. SOUTHERN has sole and absolute authority and discretion to determine, to whom and at what price the Produce will be sold, including to any entities related to or affiliated with SOUTHERN. SOUTHERN will use its best efforts to sell the Produce. However, no guaranties or warranties of any kind are made by SOUTHERN.

7.1   SOUTHERN shall have the discretion to utilize the services of sub-agents and commission brokers and/or agents to affect final sales or distress sales of Produce with quality problems when SOUTHERN reasonably believes it is in the best interest of GROWER to do so. In addition, SOUTHERN may make any adjustment or grant any allowances to customers to any sales prices which in the opinion of SOUTHERN, are justified or necessary to consummate any sale at the place of destination. SOUTHERN is authorized to order on behalf of GROWER, the total or partial destruction of shipments with sanitary or quality problems that cannot be overcome or which problems would make the Produce unsuitable for sale. The cost of any dumping or destruction shall be borne by GROWER and deducted during the liquidations. SOUTHERN shall consult with GROWER before undertaking any of the actions described in this sub-paragraph 7.1.

7.2   The parties acknowledge that daily fresh produce prices quoted in trade periodicals include such publications as the Market News Service and/or other publications of the USDA or relevant State Agencies are compiled retrospectively and may not accurately reflect market price in specific geographic markets. The parties agree, therefore, that while these published prices may serve as a guide to GROWER, SOUTHERN cannot and does not guarantee that sales at such prices shall always be obtained. Accordingly, GROWER acknowledges that SOUTHERN will sell the Produce in its reasonable business judgment and not be governed by such published standards.

7.3   GROWER shall retain title to the consigned Produce until it has been sold by SOUTHERN and shall bear all risks of market fluctuation and risk of produce deterioration until such sale has been consummated. SOUTHERN, however, shall promptly inform GROWER by facsimile following any USDA inspections involving any Produce that does not comply with phytosanitary requirements as required by the United States authorities.

4

7.4 SOUTHERN shall report final sales prices of each container to GROWER on a weekly basis.

8.. **GENERAL DISTRIBUTION AND SERVICE.** SOUTHERN shall be responsible for clearing the Produce through the Food and Drug Administration and the United States Department of Agriculture.

8.1 SOUTHERN shall have the right to add to the final selling price to its customers a fee for services provided to such customers which fees may include, but are not limited to, freight to customer, warehouse charges, pre-cooling or other special cooling supervision and/or service and palletization services. Prices quoted to SOUTHERN's customers, in some instances may include these charges at SOUTHERN's sole option. The parties acknowledge that no portion of these fees shall be passed on to GROWER and that these charges will be exclusively payable to SOUTHERN by its customers, and these fees do not constitute a portion of the price and are not included in the Liquidations (as hereinafter defined). The parties acknowledge that SOUTHERN has no obligation to disclose to GROWER, any fees it charges SOUTHERN's customers pursuant to this paragraph.

8.2 The parties recognize that instances may arise in which Produce may deteriorate in quality between the time it is graded and/or inspected upon arrival in the United states and a time for actual receipt by the customer. GROWER acknowledges that such deterioration may occur during storage and/or shipment and that all sums due from sales under Agreement shall be calculated on the basis of prices actually received from customers, unless the deterioration was due to SOUTHERN's gross negligence. In the event SOUTHERN pays GROWER based upon an estimated sale before any customer deducts, money for quality problems, then SOUTHERN shall be entitled to be repaid the sums from the next sale of Produce which may or may not be included on such subsequent liquidation at the discretion of SOUTHERN.

8.3 SOUTHERN has the right to halt shipments if, in its sole and exclusive opinion, the market conditions are such that the costs of importing will not be met or otherwise cause a negative return to GROWER. SOUTHERN shall only undertake this action after consultation with GROWER. 

8.4 All payments and purchases made by SOUTHERN to suppliers of GROWER will be considered part of the payment in advance that SOUTHERN is giving GROWER and shall be deducted from the liquidation, final liquidations and/or payments to GROWER wherever applicable.

8.5 GROWER hereby appoints SOUTHERN as its authorized agent to collect all accounts receivable due from customers. SOUTHERN shall use its best efforts to collect any and all sums due to GROWER for the Produce which may include proceedings in any administrative, state, or local agency or court, engaging collection agencies or attorneys aw well as defending any and all claims asserted against GROWER and/or SOUTHERN as a result of or in conjunction with any transaction arising from the Produce, all in SOUTHERN's sole judgment. SOUTHERN shall be responsible for all risks of collection provided the payment is not reduced, refused and/or set-off due to claims regarding quality, size, quantity or weight.

5

9. **COMPLIANCE WITH LAWS.** GROWER shall deliver to SOUTHERN USDA No. 1 quality Produce. All Produce, both prior to being shipped to the Territory, and upon arrival to the destination, shall be without disease or parasites of any kind and shall conform to USDA standards and shall be of acceptable quality for distribution in Territory. GROWER guarantees and warrants that:

9.1 All Produce delivered to SOUTHERN by GROWER shall comply with, and not be adultered or misbranded within the meaning of the U.S. Federal Food, Drug and Cosmetic Act, as amended 21 U.S.C. § 301 et seq. (the "Act") and not be an article that may not, under the provisions of 21 U.S.C. § 331, be introduced into interstate commerce adultered or misbranded within the terms of the Federal Insecticide, Fungicide and Rodenticide Act; the Federal Hazardous Substance Act; The Poison Prevention Packaging Act; and the Fair Packaging and Labeling Act, and their respective regulations and State Pure Food Act or any applicable Federal, State or local law.

9.2 Labels furnished to SOUTHERN by GROWER and affixed to such articles shall not result in misbranding within the meaning of any Federal, State or local law.

9.3 GROWER has the right, title and interest to ownership and possession of all Produce, free and clear of all claims and interests of any third-parties and any and all purchasers of the Produce from GROWER or SOUTHERN shall have full title to the Produce free and clear of all claims, liens, and encumbrances whatsoever, except for any and all sums due to SOUTHERN hereunder.

10. **LIQUIDATIONS, EXPENSES AND COMMISSIONS.** Within thirty (30) days of USDA No. 1 Produce arrival at SOUTHERN's warehouse, SOUTHERN shall present to the GROWER, a detailed accounting (hereinafter referred to as the "Liquidation") showing quantity, quality, lot, selling price, sales, Advances and Cost Expense (as hereinafter defined) of all Produce sold. All Advances, Cost Expense, and Commissions shall be deducted from the liquidation of sales before any payments are made to GROWER. Any funds remaining after deduction of Advances, Commissions and Cost Expenses shall be paid to GROWER within five days of the rendering of the Liquidation at such place as GROWER shall designate from time to time. GROWER must advise SOUTHERN, in writing, within thirty (30) days of receipt of the Liquidation, of any objections or disagreements with a Liquidation, and failing such timely notice, GROWER is deemed to agree to the amounts set forth in the Liquidation.

10.1 At the end of the original Term and each renewal Term, or thirty (30) days after the date SOUTHERN receives the GROWER's last shipment for a Term, whichever is later, SOUTHERN shall submit to GROWER a Final Liquidation. If the Final Liquidation reflects that revenues generated from the sale of the Produce was not sufficient to pay all Advances and Cost Expense to SOUTHERN, GROWER agrees to repay SOUTHERN any sums due to SOUTHERN within seven (7) days of the date that GROWER receives the Final Liquidation. All sums, dollar amounts or payments due hereunder shall be paid in United States Dollars in clear funds.

10.2 For purposes hereof the term "Cost Expense" shall mean those charges which shall be deducted by SOUTHERN from the proceeds derived from sale or disposition of the Produce which shall include all amounts paid by SOUTHERN which are an obligation of

6

GROWER, including but not limited to costs of handling, freight (ocean and in-land), drayage, inspections, carting, commissions due to SOUTHERN and/or others, handling fees, sales charges, boxing, packaging, stickers, crating, re-packaging, paneling, re-palleting, handling and/or cooling costs, loans, advances and any and all other costs as specified hereunder.

10.3 Notwithstanding anything herein to the contrary, GROWER hereby gives SOUTHERN a security interest in all Products consigned hereunder, inventory and GROWER's accounts receivable, replacements and substitutions thereof, as well as all profits, revenues, and proceeds, now or hereafter owned by or due to GROWER, as security for the payment to SOUTHERN of all obligations under this Agreement; however, SOUTHERN's security interest shall be limited to the actual dollar amount of GROWER's obligations due and owing to SOUTHERN at any give time.

11. **BUSINESS RECORDS.** SOUTHERN shall not be obligated to keep or retain any of its records more than one (1) year following the consummation of any particular or given transaction relating to the Produce.

12. **RISK OF LOSS.** All risk of loss and damage to the Produce, prior to receipt and delivery to SOUTHERN, shall be borne by the GROWER, except losses attributed to the gross negligence of SOUTHERN. Upon the request of GROWER, SOUTHERN will assist the GROWER in pursuing any claim that GROWER may have for such loss. For the purposes of this sub-paragraph 12, it is agreed and understood that SOUTHERN shall take care, custody and control of the Produce upon pick-up at GROWER's facility. Any risk of loss after pick-up at GROWER's facility shall shift to SOUTHERN.

12.1 At GROWER's expense, SOUTHERN is authorized to file, prosecute and settle all claims for Produce lost or damaged in transit, and SOUTHERN shall provide a prior copy to GROWER for its review. All legal expenses incurred for the prosecution of such claims shall be paid to SOUTHERN from proceeds thereof or in a Final Liquidation.

13. **TERMINATION.** This Agreement shall terminate upon one or more of the following events:

A. As set forth in Paragraph 3 above;

B. By SOUTHERN, upon written notice to GROWER, in the event of:

    a. The failure of GROWER to pay any and all sums due to SOUTHERN hereunder, or to comply with any of the obligations agreed upon in this Agreement;

    b. If GROWER endangers the present and/or future existence of the harvest of the Produce;

    c. Should GROWER fail to meet any of the projections set forth on Exhibit "C" hereto, or should any of said projections prove to be inaccurate;

7

      d.      If quality and condition problems with the Produce result in rejections or returns exceeding a rate of Three percent (3%).

If Southern elects to terminate this Agreement pursuant to this Section 13.B., SOUTHERN shall still be entitled to receive any Produce from the present harvest. If SOUTHERN so elects to receive the Produce from the present harvest, Southern shall be entitled to retain one hundred percent (100%) of the proceeds from the sale of said Proceeds to satisfy any outstanding obligation of GROWER to SOUTHERN, including sums due for Advances. GROWER shall grant SOUTHERN a first lien in its crop to be memorialized by way of a security agreement to be executed by the parties in the future. GROWER shall cooperate and execute any and all documents necessary to ensure that the SOUTHERN's lien has first priority. Grower shall not take any action that will compromise the priority of SOUTHERN's lien, including entering into any factoring or assignment arrangements. Nothing here-in shall be deemed to preclude the assignment agreement executed with Farm Credit of Central Florida. GROWER shall not amend said agreement without SOUTHERN prior written consent.

      C.      Upon forty five days written notice from SOUTHERN to GROWER.

      13.1      Upon any termination of this Agreement, the marketing and sale of the Produce shall be concluded, any Produce within SOUTHERN's custody and/or control shall be disposed of in the most economically efficient manner and a Final Liquidation shall be made.

      13.5      Upon any termination of this Agreement. SOUTHERN shall be authorized to immediately repay all obligations due from GROWER to SOUTHERN under this Agreement, directly from any revenues generated from the sale of the Produce.

      13.6      In the event of termination of this Agreement, for any reasons, GROWER shall immediately pay to SOUTHERN, all Advances and Cost Expenses.

## 14. **MISCELLANEOUS.**

      14.1      *Force Majeure.* Failure of either party to perform any of the provisions of this Agreement by reason of any of the following shall not constitute an event of default or breach of this Agreement: strikes, picket lines, boycott efforts, fires, floods, freezes, accidents, war (whether or not declared), revolution, riots, insurrections, acts of God, acts of government (including without limitation any agency or department of the United States of America), acts of the public enemy, scarcity or rationing of gasoline or other fuel of vital products, inability to obtain materials or labor, or other causes which are reasonably beyond the control of the defaulting party.

      14.2      **Successors.** This Agreement shall be binding on and inure to the benefit of the heirs, executors, administrators, successors, representatives and assigns, of the signing parties.

      14.3      **Relationship of Parties.** The parties have entered into this Agreement solely as independent contractors and nothing contained herein shall be construed as giving rise to a joint venture, partnership, fiduciary, or other form of business organization. Except as set forth herein, neither party shall have the authority to bind or commit the other party contractually or otherwise, unless explicitly agreed to herein.

8

**14.4  Entire Agreement.**  This Agreement constitutes the entire Agreement between the parties with respect to the subject matter hereof, and supersedes any prior or contemporaneous agreements and the understandings in connection herewith, including, but not limited to, that certain marketing agreement for tomatoes between the parties dated November 1, 2008. Exhibit "C" attached hereto contains a synopsis of this Agreement's terms (in the unlikely event there is discrepancy between the terms set forth in this Agreement and the terms listed in Exhibit "C", the terms in this Agreement shall control). This Agreement may not be modified or amended except by an instrument in writing signed by the party against whom enforcement is sought.

14.5  **Notices.**  All notices and service of process arising under this Agreement shall be in writing and sent by U.S. Mail, facsimile or hand-delivery to the addresses below:

GROWER:  Dean Diehl
D.G. Diehl Farms Inc.
C/O Thea Kurz, Bookkeeper
3926 24th Street SE
Ruskin, FL 33570-6309
Telephone No.: 813-918-9195
Facsimile No.:813-641-2838

SOUTHERN:  Robert Colescott, Jr.
1400 Southwest 6th Court, Suite B
Pompano Beach, Florida 33069
Telephone No.:
Facsimile No.:

14.6  **The Limitations.**  All suits, proceedings, or arbitration, if applicable, regarding this Agreement must be instituted within one (1) year from: i) the delivery of the Produce which is the subject of the dispute; or ii) the termination of this Agreement, whichever is sooner. Also, unless specific objection is made, in writing, to SOUTHERN by GROWER, within ninety (90) days after delivery of Final Liquidation, GROWER shall be deemed to have agreed with the Final Liquidation.

14.7  **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all, of which shall constitute one and the same Agreement.

14.8  **Governing Law and Jurisdiction.**  This Agreement shall be governed by and construed under the laws of the State of Florida, U.S.A.

14.9  **Venue and Jurisdiction.**  Venue for any dispute arising under this Agreement shall be in the Courts of the Seventeenth (17th) Judicial Circuit, in and for Broward County, Florida, U.S.A. and the parties do hereby submit to the jurisdiction and forum of said court exclusively.

**14.10 Successors and Assigns.** This Agreement and each party's obligations hereunder shall be binding on the representatives, assigns, and successors of such party and shall insure to the benefit of the assigns and successors of such party, provided that this Agreement shall not e assigned by either party without the prior written consent of the other.

**14.11 Attorney's Fees and Costs.** If any action at law, or in equity, is brought to enforce or interpret the provisions of this Agreement, the prevailing party in such action shall be entitled to reimbursement for its reasonable attorney's fees and costs, including the exhausting of all appellate rights.

**14.12 Remedies.** Each party agrees that its obligations hereunder are necessary and reasonable in order to protect the other party and the other party's business, and expressly agrees that monetary damages would be inadequate to compensate the other party for any breach of any covenant or agreement set forth herein. Accordingly, each party agrees and acknowledges that any such violation or threatened violation will cause irreparable injury to the other party and that, in addition to any other remedies that may be available, in law, in equity or otherwise, the other party shall be entitled to obtain injunctive relief against the threatened breach of this Agreement, or the continuation of any such breach, without the necessity of proving actual damages. Each party expressly waives the defense that a remedy in damages will be adequate, and further waives any requirement, in an action for specific performance or injunction, for the posting of a bond. Should either party obtain a monetary or any other type of judgment against the other party under the terms of this Agreement, the parties hereby agree and consent to the domestication and enforcement of said judgment through any court of competent jurisdiction in the United States. Failure to enforce any provision of this Agreement, shall not constitute a waiver of any term hereof.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date and year first above-written.

**SOUTHERN SPECIALTIES, INC.**
a Florida corporation

By: _____

Its: _____

**DG DIEHL FARMS, INC.**
a Florida corporation

By: _____

Its: _____

**BEST DEAL BLUEBERRIES, INC.**
a Florida corporation

By: _____

10

D G DIEHL FARMS, INC

D G DIEHL FARMS, INC

**2009 BLUEBERRY CR/JOP PAYBACK PER FLAT (BASED ON BLUEBERRY PURCHASE ORDER PRICE WHICH EQUALS FINAL SALES PRICE)**
**& BLUEBERRY WEEKLY ADVANCE TO FARM (BASED ON BLUEBERRY PURCHASE ORDER PRICE WHICH EQUALS FINAL SALES PRICE)**
EXHIBIT "A"

11

| PURCHASE ORDER PRICE = FINAL SALES PRICE | $16.00 | % | $17.00 | % | $18.00 | % | $19.00 | % |
|---|---|---|---|---|---|---|---|---|
| IMMEDIATELY PAYABLE TO FARM AND FOR SSI PAYBACK) | | | | | | | | |
| FARM FLAT ADV-WEEKLY-DUE EACH THURSDAY | 3.00 | 0.50 | 3.00 | 0.47 | 3.00 | 0.44 | 3.00 | 0.42 |
| SSI PAYBACK-ENTER ON BOOKS AS OF DATE OF SHIPMENT | 3.20 | 0.20 | 3.40 | 0.20 | 3.60 | 0.20 | 3.80 | 0.20 |
| FARM CREDIT PAYBACK | 3.20 | 0.20 | 3.40 | 0.20 | 3.60 | 0.20 | 3.80 | 0.20 |
| AT 30-DAY PO LIQUIDATION LESS SSI (COMM @ 9% DEDUCT) | 1.44 | 0.09 | 1.51 | 0.09 | 1.62 | 0.09 | 1.71 | 0.09 |
| AT 30-DAY PO LIQUIDATION LESS SSI $1.25/PKG MATERIAL DEDUC | 1.20 | 0.07 | 1.20 | 0.07 | 1.20 | 0.07 | 1.20 | 0.07 |
| 30-DAY NET $ TO FARM | | | | | | | | |

| PURCHASE ORDER PRICE = FINAL SALES PRICE | $20.00 | % | $21.00 | % | $22.00 | % | $23.00 | % |
|---|---|---|---|---|---|---|---|---|
| IMMEDIATELY PAYABLE TO FARM AND FOR SSI PAYBACK) | | | | | | | | |
| FARM FLAT ADV-WEEKLY-DUE EACH THURSDAY | 3.00 | 0.40 | 3.00 | 0.38 | 3.00 | 0.36 | 3.00 | 0.35 |
| SSI PAYBACK-ENTER ON BOOKS AS OF DATE OF SHIPMENT | 4.00 | 0.20 | 4.20 | 0.20 | 4.40 | 0.20 | 4.60 | 0.20 |
| FARM CREDIT PAYBACK | 4.00 | 0.20 | 4.20 | 0.20 | 4.40 | 0.20 | 4.60 | 0.20 |
| AT 30-DAY PO LIQUIDATION LESS SSI (COMM @ 9% DEDUCT) | 1.80 | 0.09 | 1.89 | 0.09 | 1.98 | 0.09 | 2.07 | 0.09 |
| AT 30-DAY PO LIQUIDATION LESS SSI $1.25/PKG MATERIAL DEDUC | 1.20 | 0.06 | 1.20 | 0.06 | 1.20 | 0.05 | 1.20 | 0.05 |
| 30-DAY NET $ TO FARM | | | | | | | | |

| PURCHASE ORDER PRICE = FINAL SALES PRICE | $24.00 | % | $25.00 | % | $26.00 | % | $27.00 | % |
|---|---|---|---|---|---|---|---|---|
| IMMEDIATELY PAYABLE TO FARM AND FOR SSI PAYBACK) | | | | | | | | |
| FARM FLAT ADV-WEEKLY-DUE EACH THURSDAY | 3.00 | 0.34 | 3.00 | 0.33 | 3.00 | 0.32 | 3.00 | 0.30 |
| SSI PAYBACK-ENTER ON BOOKS AS OF DATE OF SHIPMENT | 4.80 | 0.20 | 5.00 | 0.20 | 5.20 | 0.20 | 5.40 | 0.20 |
| FARM CREDIT PAYBACK | 4.80 | 0.20 | 5.00 | 0.20 | 5.20 | 0.20 | 5.40 | 0.20 |
| AT 30-DAY PO LIQUIDATION LESS SSI (COMM @ 9% DEDUCT) | 2.16 | 0.09 | 2.25 | 0.09 | 2.34 | 0.09 | 2.43 | 0.09 |
| AT 30-DAY PO LIQUIDATION LESS SSI $1.25/PKG MATERIAL DEDUC | 1.20 | 0.05 | 1.20 | 0.05 | 1.20 | 0.05 | 1.20 | 0.04 |
| 30-DAY NET $ TO FARM | | | | | | | | |

| PURCHASE ORDER PRICE = FINAL SALES PRICE | $28.00 | % | $29.00 | % | $30.00 | % |
|---|---|---|---|---|---|---|
| IMMEDIATELY PAYABLE TO FARM AND FOR SSI PAYBACK) | | | | | | |
| FARM FLAT ADV-WEEKLY-DUE EACH THURSDAY | 3.00 | 0.29 | 3.00 | 0.28 | 3.00 | 0.27 |
| SSI PAYBACK-ENTER ON BOOKS AS OF DATE OF SHIPMENT | 5.60 | 0.20 | 5.80 | 0.20 | 6.00 | 0.20 |
| FARM CREDIT PAYBACK | 5.60 | 0.20 | 5.80 | 0.20 | 6.00 | 0.20 |
| AT 30-DAY PO LIQUIDATION LESS SSI (COMM @ 9% DEDUCT) | 2.52 | 0.09 | 2.61 | 0.09 | 2.70 | 0.09 |
| AT 30-DAY PO LIQUIDATION LESS SSI $1.25/PKG MATERIAL DEDUC | 1.20 | 0.04 | 1.20 | 0.04 | 1.20 | 0.04 |
| 30-DAY NET $ TO FARM | | | | | | |

| PURCHASE ORDER PRICE = FINAL SALES PRICE | $31.00 | % | $32.00 | % | $33.00 | % | $34.00 | % |
|---|---|---|---|---|---|---|---|---|
| IMMEDIATELY PAYABLE TO FARM AND FOR SSI PAYBACK) | | | | | | | | |
| FARM FLAT ADV-WEEKLY-DUE EACH THURSDAY | 3.00 | 0.32 | 3.00 | | 3.00 | | 3.00 | |
| SSI PAYBACK-ENTER ON BOOKS AS OF DATE OF SHIPMENT | 6.20 | 0.20 | 6.40 | 0.20 | 6.60 | 0.20 | 6.80 | 0.20 |
| FARM CREDIT PAYBACK | 6.20 | 0.20 | 6.40 | 0.20 | 6.60 | 0.20 | 6.80 | 0.20 |
| AT 30-DAY PO LIQUIDATION LESS SSI (COMM @ 9% DEDUCT) | 2.79 | 0.09 | 2.88 | 0.09 | 2.97 | 0.09 | 3.06 | 0.09 |
| AT 30-DAY PO LIQUIDATION LESS SSI $1.25/PKG MATERIAL DEDUC | 1.20 | 0.04 | 1.20 | 0.04 | 1.20 | 0.04 | 1.20 | 0.04 |
| 30-DAY NET $ TO FARM | | | | | | | | |

| PURCHASE ORDER PRICE = FINAL SALES PRICE | $36.00 | % | $38.00 | % | $37.00 | % |
|---|---|---|---|---|---|---|
| IMMEDIATELY PAYABLE TO FARM AND FOR SSI PAYBACK) | | | | | | |
| FARM FLAT ADV-WEEKLY-DUE EACH THURSDAY | 3.00 | 0.31 | 3.00 | 0.31 | 3.00 | 0.30 |
| SSI PAYBACK-ENTER ON BOOKS AS OF DATE OF SHIPMENT | 7.20 | 0.20 | 7.20 | 0.20 | 7.40 | 0.20 |
| FARM CREDIT PAYBACK | 7.20 | 0.20 | 7.20 | 0.20 | 7.40 | 0.20 |
| AT 30-DAY PO LIQUIDATION LESS SSI (COMM @ 9% DEDUCT) | 3.16 | 0.09 | 3.24 | 0.09 | 3.33 | 0.09 |
| AT 30-DAY PO LIQUIDATION LESS SSI $1.25/PKG MATERIAL DEDUC | 1.20 | 0.03 | 1.20 | 0.03 | 1.20 | 0.03 |
| 30-DAY NET $ TO FARM | | | | | | |

| PURCHASE ORDER PRICE = FINAL SALES PRICE | $38.00 | % | $39.00 | % | $40.00 | % |
|---|---|---|---|---|---|---|
| IMMEDIATELY PAYABLE TO FARM AND FOR SSI PAYBACK) | | | | | | |
| FARM FLAT ADV-WEEKLY-DUE EACH THURSDAY | 3.00 | 0.32 | 3.00 | 0.31 | 3.00 | 0.30 |
| SSI PAYBACK-ENTER ON BOOKS AS OF DATE OF SHIPMENT | 7.60 | 0.20 | 7.80 | 0.20 | 8.00 | 0.20 |
| FARM CREDIT PAYBACK | 7.60 | 0.20 | 7.80 | 0.20 | 8.00 | 0.20 |
| AT 30-DAY PO LIQUIDATION LESS SSI (COMM @ 9% DEDUCT) | 3.42 | 0.09 | 3.51 | 0.09 | 3.60 | 0.09 |
| AT 30-DAY PO LIQUIDATION LESS SSI $1.25/PKG MATERIAL DEDUC | 1.20 | 0.03 | 1.20 | 0.03 | 1.20 | 0.03 |
| 30-DAY NET $ TO FARM | | | | | | |

| PURCHASE ORDER PRICE = FINAL SALES PRICE | $41.00 | % | $42.00 | % | $43.00 | % | $44.00 | % | $45.00 | % |
|---|---|---|---|---|---|---|---|---|---|---|
| IMMEDIATELY PAYABLE TO FARM AND FOR SSI PAYBACK) | | | | | | | | | | |
| FARM FLAT ADV-WEEKLY-DUE EACH THURSDAY | 3.00 | 0.32 | 3.00 | 0.31 | 3.00 | 0.31 | 3.00 | 0.30 | 3.00 | 0.29 |
| SSI PAYBACK-ENTER ON BOOKS AS OF DATE OF SHIPMENT | 8.20 | 0.20 | 8.40 | 0.20 | 8.60 | 0.20 | 8.80 | 0.20 | 9.00 | 0.20 |
| FARM CREDIT PAYBACK | 8.20 | 0.20 | 8.40 | 0.20 | 8.60 | 0.20 | 8.80 | 0.20 | 9.00 | 0.20 |
| AT 30-DAY PO LIQUIDATION LESS SSI (COMM @ 9% DEDUCT) | 3.69 | 0.09 | 3.78 | 0.09 | 3.87 | 0.09 | 3.96 | 0.09 | 4.05 | 0.09 |
| AT 30-DAY PO LIQUIDATION LESS SSI $1.25/PKG MATERIAL DEDUC | 1.20 | 0.03 | 1.20 | 0.03 | 1.20 | 0.03 | 1.20 | 0.03 | 1.20 | 0.03 |
| 30-DAY NET $ TO FARM | | | | | | | | | | |

# CONSOLIDATED, AMENDED AND RESTATED PROMISSORY NOTE

$379,812.00

March 1, 2009
Miami, Florida

For purposes hereof, the following terms are defined:

(i)  **Holder** shall mean **SOUTHERN SPECIALTIES, INC., a Florida corporation.**

(ii)  **Maker** shall mean **DG DIEHL FARMS, INC,**

(iii)  **Maturity Date** shall mean no later than June 1, 2009.

(iv)  **Principal Amount** shall mean **SEVEN HUNDRED AND TWENTY SEVEN THOUSAND NINE HUNDRED AND NINETY TWO DOLLARS ($379,812.00).** *or 379,092 ??*

**FOR VALUE RECEIVED,** Maker promises to pay to the order of Holder, the Principal Amount on the Maturity Date together with interest thereon from the date above at the rate of ten percent (9.25%) per annum until maturity. Maker shall have the right to prepay this Note at any time without penalty.

This Note is payable in United States dollars at the Holder's offices at 1430 SW 6th Court, Pompano Beach, Florida 33069, or at such other place as the payee or holder hereof may hereafter designate in writing.

All Makers or endorses who now or hereafter become parties hereto jointly and severally waive presentment, demand, notice of nonpayment or protest, notice of dishonor, and diligence. All Makers and endorses further promise and agree to pay in the event of a default, all costs and expenses incurred in the collection of this Note, including reasonable attorney's fees, and also those costs, expenses and attorney's fees incurred in appellate proceedings, if any.

In the event of a default, this Note shall bear interest at the rate of eighteen percent (18%) per annum from the date of the default.

Should Maker default in any other obligation to Holder, at its option, may declare a default of this Note.

This Note and the rights and obligations of the parties hereto shall be interpreted, construed, and enforced in accordance with the laws of the State of Florida. Maker and Holder agree to

1 A

submit to the personal jurisdiction of, and that the venue for any proceeding under or relating to this Note shall be in, Broward County, Florida.

The Holder does not intend to violate any applicable usury laws. Accordingly, all agreements between Maker and Holder are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid Principal amount hereof, or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forbearance or detention of the money to be advanced hereunder exceed the maximum rate allowed by applicable law. If, from any circumstances whatsoever, fulfillment of any obligation set forth herein or any other document securing this Note, at the time performance of such obligation shall be due, shall cause the effective rate of interest upon the sums evidenced by this Note to exceed the maximum rate of interest allowed by applicable law, then, the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law and to the extent that the Holder shall receive any sum which would constitute excessive interest, such sum shall be applied to the reduction of the unpaid Principal Amount due hereunder and not to the payment of interest or, if such excessive interest exceeds the unpaid balance of principal, the excess shall be refunded to the Maker. This provision shall control every other provision of all agreements between the Maker and the Holder.

The provisions of this Note shall be construed and interpreted and all rights and obligations hereunder governed by and determined in accordance with the laws of the State of Florida. All nouns and pronouns contained in this instrument shall mean and include the plural as well as the singular, and the masculine, feminine and neuter gender whenever and wherever the context so admits or requires.

This Note is given in consolidation and modification of the principal indebtedness previously evidenced by a series of promissory notes totaling the principal amount of $460,000.00 executed by Maker and executed in connection with a marketing agreement for tomatoes between the parties.

MAKER AND HOLDER (BY ACCEPTANCE OF THIS NOTE) HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER HOLDER OR MAKER. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE HOLDER EXTENDING CREDIT TO MAKER.

DG DIEHL FARMS, INC.

By: _____

Its: _____

2.A

# EXHIBIT C

CHEM ANALYSIS

| | | Tomato | | Blueberries | | Total |
|---|---|---|---|---|---|---|
| | | | | **SCENARIO 1: Agreed** | | |
| Ave. Est. Mkt price | $ | 8.00 | $ | 22.00 | | |
| Projected Volume to sell | | 72,600 | | 88,500 | | 91,100 |
| Total Est. Sales | $ | 180,200 | $ | 1,507,000 | $ | 1,687,800 |
| per pallet est | | 144 | | 196 | | |
| Payback Rate 5SI | | | | 20% | | |
| Total Est Advance Recovery 5SI | $ | | $ | 301,400 | $ | 301,400 |
| Farm Credit Payback Rate | | | | 20% | | |
| Total Est Advance Recovery Farm Credit | | | $ | 301,400 | $ | 301,400 |
| Subtotal | $ | 180,200 | $ | 904,200 | $ | 1,085,000 |
| Commission 5SI | 9% $ | 16,272 | $ | 135,830 | $ | 151,302 |
| Subtotal | $ | 164,628 | $ | 768,570 | $ | 933,098 |
| Est Returns % | 3% $ | 5,424 | $ | 45,216 | $ | 50,634 |
| Less net charges (see analysis below) | $ | 19,080 | $ | 106,469 | $ | 126,489 |
| Return to the Grower | $ | 146,448 | $ | 614,951 | $ | 795,975 |
| Est Grower Op Costs | | 115,000 | $ | 411,000 | $ | 524,000 |
| Total Profit/(loss) to grower | $ | 33,448 | $ | 263,951 | $ | 251,975 |

**BALANCE ANALYSIS (Scenario 1)**

| | | |
|---|---|---|
| Beginning Balance | $ | 459,175 |
| Plus: Add'l requested Advance | | Negotiating |
| Less: Equipment Value | $ | (100,000) |
| Less: tomato start up credit | | |
| Plus Interest | $ | 20,637 | interest bal at 2/28/11 includes tomato exp |
| Advance balance to recover | $ | 379,812 |
| Est Advance Recovery | $ | (301,400) |
| Proj Remaining Balance 5SI End of Season | $ | 78,412 |

---

**5SI Charges deduction plan**

5SI
| $ | 35,450 | 97¢ per pallet charge (190 flats per pallet) |
| $ | 31,883 | Storage Handling Charge 85 cents per flat |
| $ | 67,333 | Sub total |
| $ | 309,820 | Pack material cost ($52.2 per flat) |
| $ | 376,653 | Subtotal |
| $ | (35,450) | Waive pallet chrg |
| $ | (32,796) | 50% Flats direct shipped | $0.72 per flat saved |
| $ | 308,409 | |

Pallet surcharge program
Waive for direct shipments

---

**PAYOUT Schedule**

None
(advance recovery rate
will be adjusted up in
accordance with any
advance payouts)

**Estimated Cost to Grower (Bean)**

bbles
pick/pack/labor
$        6 per flat
tomato
$        5 per flat

**Projected Volume Tomatoes**
Grape Tomatoes only

Total    $

**Item points:**

If at any time 5SI deems crop conditions are not acceptable to yield volume projected payouts discontinued and all remaining sales $ will be retained to recoup balance o/s for the season.

Advance Recovery Rate will be adjusted upward with every additional advance distribution at discretion of 5SI

5SI to verify crop conditions periodically.

Exclusive through 2011

9.25% Interest rate

Farm Credit to sign addendum stating 5SI balance/charges to be paid first from proceeds of sales as priority over lien on crop

# FIRST AMENDMENT TO MARKETING AGREEMENT

THIS FIRST AMENDMENT is made and entered into this 20th day of August 2009, by SOUTHERN SPECIALTIES, INC., a Florida corporation ("Southern") and DG DIEHL FARMS, INC., a Florida corporation ("Grower").

WHEREAS, Southern and Grower entered into a Marketing Agreement on 3-01-___, 2009;

WHEREAS, Grower executed a promissory note in favor of Southern to secure the repayment of certain advances made to Grower which promissory note Grower has failed to satisfy;

WHEREAS, Grower has requested additional advances to be made for the 2009 and 2010 growing season; and

WHEREAS, Southern has agreed to advance additional sums provided Grower increases the rate at which the advances are refunded.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the parties agree as follows:

1.      The foregoing recitals are true and correct and are hereby incorporated as a part of this Amendment. In the event of any conflict between this Amendment and the Marketing Agreement, the terms in this Amendment shall prevail and control. Capitalized terms used in this Amendment will have the same meaning given to them in the Marketing Agreement.

2.      Southern agrees to advance to Grower $125,000 for the 2009 and 2010 growing season to be funded as follows:

   a.      $18,000 on August 20, 2009
   b.      $17,000 on August 27, 2009
   c.      $5,000 per week September 17-December 9, 2009
   d.      $5,000 per week January 21- February 25, 2010

3.      Grower shall execute an Amended and Restated Promissory Note which shall evidence and secure the advances set forth in paragraph 2 above. The Amended and Restated Promissory Note shall also replace the prior promissory note executed by Grower in favor of Southern and evidence and secure a past due balance of principal and interest due thereunder of $194,637, bringing the total principal amount of the Amended and Restated Promissory Note to $319,637.

4.      Grower agrees that Southern shall be entitled to deduct twenty five percent (25%) from the gross sales of the Produce to recover the sums due under the Amended and Restated Promissory Note. Southern may increase the rate of deduction at its election

MIAMI 2101023_1

in the event that the volumes or sales do not meet projections to ensure repayment of the sums due under the Amended and Restated Promissory Note.

5.    Except as specifically modified herein, the Agreement shall remain unchanged and in full force and effect and is hereby ratified.

6.    A facsimile copy of this Amendment and any signatures hereon shall be considered for all purposes as originals. This Amendment may be executed in counterparts.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the day and year first set forth above.

Dated this 20th day of August, 2009.

DG DIEHL FARMS, INC.

By: _____
Print Name: Dean C. Diehl

SOUTHERN SPECIALTIES, INC.

By: _____
Print Name: Theresa Perrotta

# CONSOLIDATED, AMENDED AND RESTATED PROMISSORY NOTE

$319,637.00

August 20, 2009
Pompano Beach, Florida

For purposes hereof, the following terms are defined:

(i)    Holder shall mean **SOUTHERN SPECIALTIES, INC.,** a Florida corporation.

(ii)    Maker shall mean **DG DIEHL FARMS, INC.**

(iii)    Maturity Date shall mean no later than June 1, 2010.

(iv)    Principal Amount shall mean **THREE HUNDRED AND NINETEEN THOUSAND SIX HUNDRED AND THIRTY SEVEN DOLLARS ($319,637.00).**

FOR VALUE RECEIVED, Maker promises to pay to the order of Holder, the Principal Amount on the Maturity Date together with interest thereon from the date above at the rate of nine and one quarter percent (9.25%) per month until maturity. Maker shall have the right to prepay this Note at any time without penalty.

This Note is payable in United States dollars at the Holder's offices at 1430 SW 6th Court, Pompano Beach, Florida 33069, or at such other place as the payee or holder hereof may hereafter designate in writing.

All Makers or endorses who now or hereafter become parties hereto jointly and severally waive presentment, demand, notice of nonpayment or protest, notice of dishonor, and diligence. All Makers and endorses further promise and agree to pay in the event of a default, all costs and expenses incurred in the collection of this Note, including reasonable attorney's fees, and also those costs, expenses and attorney's fees incurred in appellate proceedings, if any.

In the event of a default, this Note shall bear interest at the rate of eighteen percent (18%) per annum from the date of the default.

Should Maker default in any other obligation to Holder, at its option, may declare a default of this Note.

This Note and the rights and obligations of the parties hereto shall be interpreted, construed, and enforced in accordance with the laws of the State of Florida. Maker and Holder agree to

submit to the personal jurisdiction of; and that the venue for any proceeding under or relating to this Note shall be in, Broward County, Florida.

The Holder does not intend to violate any applicable usury laws. Accordingly, all agreements between Maker and Holder are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid Principal amount hereof, or otherwise, shall the amount paid or agreed to be paid to the Holder for the use, forbearance or detention of the money to be advanced hereunder exceed the maximum rate allowed by applicable law. If, from any circumstances whatsoever, fulfillment of any obligation set forth herein or any other document securing this Note, at the time performance of such obligation shall be due, shall cause the effective rate of interest upon the sums evidenced by this Note to exceed the maximum rate of interest allowed by applicable law, then, the obligation to be fulfilled shall be reduced automatically to the extent necessary to prevent that effective rate of interest from exceeding the maximum rate allowable under applicable law and to the extent that the Holder shall receive any sum which would constitute excessive interest, such sum shall be applied to the reduction of the unpaid Principal Amount due hereunder and not to the payment of interest or, if such excessive interest exceeds the unpaid balance of principal, the excess shall be refunded to the Maker. This provision shall control every other provision of all agreements between the Maker and the Holder.

The provisions of this Note shall be construed and interpreted and all rights and obligations hereunder governed by and determined in accordance with the laws of the State of Florida. All nouns and pronouns contained in this instrument shall mean and include the plural as well as the singular, and the masculine, feminine and neuter gender whenever and wherever the context so admits or requires.

This Note is given in consolidation and modification of the principal indebtedness previously evidenced by a promissory note totaling the principal amount of $379,812.00 executed by Maker and executed in connection with a marketing agreement for blueberries and tomatoes between the parties.

MAKER AND HOLDER (BY ACCEPTANCE OF THIS NOTE) HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER HOLDER OR MAKER. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE HOLDER EXTENDING CREDIT TO MAKER.

DG DIEHL FARMS, INC.

By: _____

Its: _____

CASE NO.: 10-12091(14)

Southern Specialties, Inc.

      Plaintiff,

vs.

Best Deal Blueberries, Inc. &

D. G. Diehl Farms, Inc. Defendant.

)
)
)
)
)
)
)
)
)
)

ORDER

THIS CAUSE was considered by the Court on the following Motion(s) PLAINTIFF'S
EMERGENCY MOTION FOR TEMPORARY INJUNCTION WITH VIDEOS

HEARING was held on March 18, 2010

THE COURT having considered the grounds for the Motion, taken testimony, heard argument and considered the applicable law, it is FOUND,

ORDERED AND ADJUDGED as follows:

MOTION is GRANTED. Defendants shall comply with the
Contract between the parties.

DONE AND ORDERED March 18, 2010

MARC H. GOLD

MAR 18 2010

CIRCUIT COURT JUDGE

A TRUE COPY

Copies furnished: ☑ In Open Court
                  ☐ By Mail

BC 118 (Rev 2/07)

EXHIBIT

"B"